UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                              :

**RAURK MELENDEZ**,                          :

                       Petitioner,       :

                                              :    **MEMORANDUM DECISION AND**

                            – against –          :    **ORDER**

                                              :    20-CV-6371 (AMD)

**CHRISTOPHER MILLER**,             :

                                              :

                       Respondent.      :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      The petitioner, currently incarcerated at the Great Meadow Correctional Facility,

petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner is serving

concurrent prison terms of 23 years for first degree assault and one year for criminal possession

of a weapon in the fourth degree.  The petitioner argues that the prosecution denied him equal

protection by exercising peremptory challenges to exclude Black jurors in violation of *Batson v.*

*Kentucky*, 476 U.S. 79 (1986), that the trial court denied him the right to present a defense by

precluding certain photographs and text messages, and that the prosecution's remarks in

summation were unfairly prejudicial.  For the following reasons, the petition is denied.

## BACKGROUND

      On August 5, 2012, the petitioner and his co-defendant Jamel Williams attacked Randy

Rupansingh during a drug transaction.  (*See* Trial Transcript ("T. Tr.") at 623–25.)[1]  The

petitioner stabbed the victim multiple times, while Williams punched and kicked him as he lay

on the ground.  (*Id.* at 883–87.)  The victim's brother rushed him to the hospital, where he

---

[1] The trial transcripts can be found at ECF Nos. 1-1 through 1-6.

received emergency surgery.  (*Id.* at 1583–86, 1912–13.)  The victim survived, but has lasting effects from the stabbing.  (*Id.* at 1932–35.)

The petitioner and Williams were subsequently charged in a five-count indictment with (1) second-degree attempted murder, (2) first-degree assault, (3) first-degree attempted robbery, (4) second-degree attempted robbery, and (5) fourth-degree criminal possession of a weapon. (*Id.* at 625–27.)

The petitioner and Williams went to trial before the Honorable Ira Margulis and a jury in Queens County Supreme Court.  (*Id.* at 1, 479.)

## I.    Pretrial Jury Selection and *Batson* Challenge

During the first round of jury selection, the prosecution made a "reverse-*Batson* challenge" to the defense's use of peremptory challenges to exclude prospective white male jurors.  (*See* T. Tr. 266.)  *Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Kern*, 75 N.Y.2d 638 (1990).  The trial judge did not "see any pattern that would warrant further inquiry," and rejected the challenge.  (T. Tr. 267.)

During the second round of jury selection, the defense made its own *Batson* challenge, and argued that the prosecution was using peremptory challenges to exclude one prospective Black juror in the first round, and four Black jurors in the second round.  (*Id.* at 394.)

The trial court ruled that the defense had not made a *prima facie* showing under *Batson*, but permitted the prosecution to make a record.  (*Id.* at 397.)  The prosecutor argued that there was no pattern of race-based peremptory challenges, noting a Black man and woman had already been selected as jurors.[2]  (*Id.* at 398.)  The prosecution explained that he challenged one woman because she read the Bible in her spare time, which made the prosecutor wonder whether she

---

[2] The defense claimed that the female juror was Hispanic.  (*See* T. Tr. 397–98.)

would have a "difficult time standing in judgment of other people."  (*Id.* at 398.)  That same juror expressed skepticism about holding someone who was acting in concert responsible for a violent act if he did not personally commit the act.  (*Id.* at 398–99.)  The prosecutor had similar concerns about whether a second juror who went to church in her spare time could sit in judgment of someone else.  (*Id.* at 399.)[3]  The prosecutor did not explain why he exercised peremptory challenges against two other jurors.

      The court repeated that the defense had not established a *prima facie* case, and that "if there were to be a *prima facie* case, I think the People have given race neutral reasons for their challenges."  (*Id.* at 401.)  The court stated that "this is an issue where the Appellate courts are not sitting in the courtroom and cannot see the body language and other responses given by the prospective jurors;" the court observed that one challenged juror was "very combative" and that this was "certainly a race neutral reason that the prosecutor might not want him on."  (*Id.* at 401–402.)  The court also noted that "[c]hurch goers are not a cognizable group as far as I know that require any protection."  (*Id.* at 402.)

      Defense counsel responded that the prosecutor did not challenge a different juror who sang in a church choir.  (*Id.* at 403.)  The court clarified that the juror "started off by saying as a hobby she sings," and only revealed that she sang in a church choir when the court "inquired further;" this was "different" from "somebody who regularly reads the Bible or whose hobby is reading the Bible."  (*Id.*)

      When the defense exercised its challenges, the prosecutor made another reverse-*Batson* challenge, which the judge denied.  (*Id.* at 404–07.)  The judge also denied defense counsel's

---

[3] In addition, the prosecutor was "uncomfortable" because he had gotten this juror's name wrong three times during questioning.  (T. Tr. 399.)

*Batson* challenge to the prosecutor's peremptory challenge to another Black juror. (*Id.* at 410–411.)

## II.   Trial

### a.   The Prosecution's Case

The prosecution called eight witnesses: NYPD Sergeant Michelle Kemp, Randy Rupansingh, building supervisor Deolindo Cesar, Kevin Rupansingh, NYPD Detective James Polo, Verizon Wireless representative Crystal Lonneberg, Queens County District Attorney's Office Detective Joseph Diehn, and emergency surgeon Dr. Michael Coomaraswamy. The prosecution also introduced surveillance video that showed a portion of the attack.[4] The testimony and the video established the following facts.

On the afternoon of August 5, 2012, Randy Rupansingh contacted Jamel Williams, a customer at his family's liquor store in Queens, to get marijuana for him and his younger brother Kevin Rupansingh. (*Id.* at 842–46, 848–49, 1003–11, 1287–88.) Randy and Williams exchanged text messages and calls. (*Id.* at 850–52.)

At around 8:00 p.m., Kevin drove Randy to meet Williams at Phlox Place near the Rupansingh family's liquor store. (*Id.* at 854.) Williams and the petitioner were standing in front of an apartment building. (*Id.* at 859–60.)

---

[4] The prosecutor described the video in his opening statement:

> [Y]ou'll see these defendants arrive together at just around 7:48 in the evening at that building on Phlox 5 Place. And you will see these defendants . . . wait together for more than 26 minutes for Randy and Kevin to show up. And you will see the . . . attack by Defendant Jamel Williams that started this whole incident. You will see the . . . chaos that ensued as Randy Rupansingh ran for his life and Jamel Williams ran after him and Ruark Melendez ran after him and Kevin Rupansingh . . . get back in the car, tries to do a u-turn. Now, they ran off screen . . . .

(T. Tr. 631; *see also id.* at 641 (the petitioner's opening statement) (describing the surveillance video footage); *id.* at 2176–93 (the prosecutor's closing statement) (same).)

4

Williams got in the backseat of the car and told Randy to get out of the car.  (*Id.* at 861–62, 1469–72.)  When Randy refused, he and Williams argued for a few minutes, and Williams spoke with the petitioner.  (*Id.* at 1472–77.)  He returned to the car and told Randy to get out. (*Id.*)  Randy showed Williams his money in an effort to prove that he was not planning to rob Williams and was serious about paying him.  (*Id.* at 1477–78.)

Randy eventually got out of the car and followed Williams to the building.  (*Id.* at 1479.) As they argued about whether Randy had to go inside, Williams suddenly punched Randy in the jaw.  (*Id.* at 872–73, 1480, 1500.)  Randy ran away, and Williams and the petitioner chased him. (*Id.* at 874, 1503–05.)  Williams yelled at Randy to give him the money, and vowed to kill Randy.  (*Id.* at 1503.)

Meanwhile, Kevin was driving around looking for Randy when he saw the petitioner standing in the middle of the block.  (*Id.* at 1579–80.)  The petitioner "flashed a knife" and Kevin yelled, "Where's Randy?"  (*Id.* at 1580–82.)  The petitioner ran towards Cherry Avenue.  (*Id.*)

The petitioner then approached Randy from the front, his fists raised, while Williams came up behind him, yelling that Randy had money in his hand.  (*Id.* at 876–77, 1263–64, 1509–10.)  The petitioner struck at Randy, who immediately felt blood coming from his neck, and stabbed him in the thigh.  (*Id.*)  The petitioner and Williams repeatedly hit and kicked Randy as he lay on the ground.  (*Id.* at 883–87.)

Kevin drove up shortly thereafter.  The petitioner and Williams ran away, and Kevin rushed Randy to the hospital.  (*Id.* at 1583–86.)  Randy required immediate surgery for the stab wound on his neck.  (*Id.* at 1913–15.)  He suffered lasting nerve damage and the left side of his body was paralyzed for months.  (*Id.* at 1932–35.)  At the time of trial, he had not regained full mobility.  (*Id.*)

### i. Evidentiary Rulings

In an effort to suggest that Randy Rupansingh was a drug dealer, defense counsel moved to introduce photographs and photocopies of text messages.

The court admitted photographs from Randy's cell phone which showed him holding "large quantities of hundred-dollar bills, five-dollar bills, [and] twenty-dollar bills." (*Id.* at 1162–63, 1181.) The court denied the application to introduce photographs of Randy with a BMW car, jewelry, and "what may be a bag of marijuana or another controlled substance" because the "prejudice outweigh[ed] any probative value." (*Id.*)

Randy admitted during cross-examination that he sent text messages in which he discussed drug sales. (*See id.* at 1210–13.) The petitioner's counsel moved to admit copies of the messages into evidence because it would be "confusing to the jury" to "have the testimony which we can refer to during the course of the case and in closing[] regarding texts" but to not "be able to see those texts that [Randy] already testified about in detail." (*Id.* at 1211–13.) The court denied the application because the content of the messages was on the record, and the jury could "always ask for read back of that testimony." (*Id.* at 1213–14, 1228.)

### ii. The Defense Case

The defense did not put on any evidence. (*Id.* at 1966.)

### b.   The Prosecution's Summation and the Defense Motion for a Mistrial[5]

The court made the following rulings to defense counsel's objections during the prosecutor's summation:

- Overruled Williams' counsel's general objection to the prosecutor's comment in reference to defense cross-examination that the jury should not "get distracted by the side show." (*Id.* at 2155.)

---

[5] The court denied the defense motions for an order of dismissal after the prosecution rested and at the close of the entire case. (*Id.* at 1998–2008.) The petitioner does not challenge those rulings.

- Overruled the petitioner's counsel's general objection to the prosecutor's statement that the petitioner and Williams chased Randy "down those blocks, down that street, passing those houses, where all of us live." (*Id.* at 2156.)

- Sustained Williams' counsel's general objection to the prosecutor's remark that defense counsel didn't "know that Jack may be slang for phone" or "how to say Kisseena," the name of a local street. (*Id.* at 2157.)

- Sustained the petitioner's counsel's specific objection that the prosecutor was "vouching" when he made the following responses to defense counsel's attack on Randy's credibility. "You are being asked to evaluate whether you can believe Randy . . . [because] he was drunk one night, got into an argument with his grandmother," and "when he was fifteen, he got into a fight with his uncle." (*Id.* at 2169–70.) "A fight with your grandmother and a fight with your uncle, if that means you're not worthy of belief, I wouldn't want you to see what happens in my house and my family." (*Id.* at 2170.)

- Sustained the petitioner's counsel's general objection to the remark that the petitioner's attorney was "the only people you saw get belligerent" in the courtroom during trial. (*Id.* at 2171.)

- Sustained the petitioner's counsel's general objection to these comments: (1) the defense was "ask[ing] [the jury] to be distracted by the side show;" (2) "Thank goodness for the video" of the incident and the other evidence that "proves beyond a reasonable doubt that these defendants are guilty;" and (3) "Can you imagine what the argument would have been if there was no video?" (*Id.* at 2172–73.)

- Sustained the petitioner's counsel's specific objection to the prosecutor's statement that the description of the video evidence showed the petitioner and Williams walking off camera "deeper into the building" "to make sure that [the defendants] knew how to get out." (*Id.* at 2184.)

- Overruled Williams' counsel's general objection to the statement that the petitioner and Williams "didn't expect Randy Rupansingh to show up at that spot with his brother, so . . . . Jamel Williams had to figure out a way . . . to get Randy Rupansingh from the car . . . to the building." (*Id.* at 2187.)

- Sustained the petitioner's counsel's general objection to the prosecutor's claim that the petitioner "was [Williams's] muscle" and he "couldn't do it alone." (*Id.* at 2189.)

- Overruled the petitioner's counsel's specific objection that the prosecutor was "burden shifting" when he said that the petitioner was "in the vestibule area while Jamel Williams [was] in the car, again, trying to get Randy Rupansingh out," and "that's what the testimony is, . . . we haven't heard anything differently." (*Id.* at 2189–90.)

- Sustained the petitioner's counsel's general objection to the statement that the petitioner was Williams's "crony, his cohort . . . his partner in crime." (*Id.* at 2190.)

The petitioner moved for a mistrial "based on all the objections . . . as a result of the

inappropriate comments made by" the prosecution. (*Id.* at 2207.) The court denied the motion,

ruling that the prosecution's comments "were a fair response to [the defense's] summations," while observing that the court "did sustain some of them," and that "over all . . . the People's summation [did not go] beyond the lines of fair comment to require a mistrial." (*Id.*)

### c.    Verdict and Sentence

On April 1, 2015, the jury found the petitioner guilty of first-degree assault and fourth-degree criminal possession of a weapon, and acquitted him of second-degree attempted murder and first- and second-degree attempted robbery. (*Id.* at 2285–87.)[6]

On April 30, 2015, the court sentenced the petitioner as a predicate felon to a determinate 23 years' prison term, followed by five years of post-release supervision for the first-degree assault, and a concurrent one-year term for fourth-degree criminal possession of a weapon. (Sentencing Transcript, ECF No. 1-6 ("S. Tr.") 42:18–43:16.)[7]

## PROCEDURAL HISTORY

### I.  Direct Appeal

The petitioner appealed his conviction to the Appellate Division, Second Department. He raised six claims, three of which are relevant to this petition: (1) the prosecutor exercised peremptory challenges to exclude Black jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the trial court denied him the right to present a defense by precluding photographic and text message evidence; and (3) the prosecution's remarks in summation were unfairly prejudicial. (ECF No. 1-7.)

---

[6] The jury found Williams guilty of first-degree assault, and acquitted him of second-degree attempted murder, first-degree and second-degree attempted robbery, and fourth-degree criminal possession of a weapon. (T. Tr. 2287–88.)

[7] The petitioner also pled guilty in an unrelated case. (*See* S. Tr. 7–10.) The court sentenced the petitioner to a two-years determinate prison term for that case, followed by one and a half years post-release supervision to run concurrent to the sentence for the first-degree assault and fourth-degree criminal possession of a weapon convictions. (*Id.* at 11.)

The Second Department unanimously affirmed the conviction.  (ECF No. 1-9.)  The court rejected the *Batson* challenge, because the petitioner "failed to satisfy his ultimate burden of demonstrating, under the third prong of the *Batson* analysis, that the prosecutor's race-neutral explanation for the questioned peremptory challenges was a pretext for racial discrimination." (*Id.* at 1.)  The court affirmed the trial court's "refusal to admit [into evidence] certain photographs" of the victim with cars, jewelry, and narcotics because "such photographs were not relevant as they did not tend to prove the existence or nonexistence of a material fact directly at issue and any probative value was outweighed by the possible prejudicial impact on the jury." (*Id.* at 2.)  The court also upheld the trial court's refusal to admit "photocopies of certain text messages" as "not prejudicial to the defendant because these text messages were read in their entirety into the record by defense counsel and the jury was free to request a read back of the content of the messages."  (*Id.*)  The court rejected the defendant's "contention that comments made by the prosecutor in summation were improper and deprived him of a fair trial," as they were "largely unpreserved for appellate review . . . and, in any event, [] without merit" because they were "either fair comment on the evidence, a fair response to arguments and theories presented in the defense summation, or not so egregious as to have deprived the defendant of a fair trial."  (*Id.* (citations omitted).)

The New York Court of Appeals denied the petitioner's application for leave to appeal on January 2, 2020.  (ECF No. 1-12 at 2.)

**II.    Federal Habeas Petition**

The petitioner filed this petition on December 30, 2020.  (ECF No. 1.)  He raises the following claims, which he also made on appeal to the Second Department: the *Batson* claim, the claims about the photographic and test message evidence, and the argument about the prosecutor's summation.  (*Id.*)

**LEGAL STANDARD**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits the authority of federal courts to grant writs of habeas corpus to state prisoners.  Section 2254(a) permits a federal court to entertain only those applications claiming violations "of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Sections 2254(b) and (c) prevent a federal court from granting the writ if the applicant has not exhausted state remedies.

A petitioner can seek federal habeas corpus relief only after he exhausts his state court remedies and gives the state court a fair and full opportunity to review the merits of the claim.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

Even when issues are properly before a federal court, AEDPA's standards are "difficult to meet" because the Act provides a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted).  Accordingly, a federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This bar applies to substantive and procedural state law grounds alike.  *Id.* at 729–30.

As for claims that have been "adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).  Federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits," and the petitioner carries the burden of proof." *Id.* at 180–81.

"When a state court" "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment," "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim — even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  For example, a state court ruling simply that a claim is "without merit" constitutes an adjudication on the merits of that claim. *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006) (citing *Fama v. Comm'r of Corr. Services*, 235 F.3d 804, 810–11 (2d Cir. 2000)).  In such a case, "the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Sellan*, 261 F.3d at 311–12.

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13.  The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000).  The state court's

factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## DISCUSSION

The petitioner advances three arguments: (1) the prosecution exercised peremptory challenges to exclude Black jurors in violation of *Batson*; (2) the trial court should not have precluded the petitioner from introducing photographic and text message evidence; and (3) the prosecution's remarks in summation were unfairly prejudicial.  I address each argument in turn.

## I.   *Batson* Challenge

The petitioner argues that the Second Department's decision affirming the denial of his *Batson* challenge was based on an unreasonable determination of facts and an unreasonable application of federal constitutional law.[8]

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court established a three-part test for courts to apply when considering whether a peremptory challenge is based on an impermissible discriminatory motive.

(1) The party objecting to the exercise of the peremptory challenge must make a *prima facie* showing that the proponent of the peremptory challenge did so with an intent to discriminate.  *Id.* at 93–97.

(2) If the objecting party makes a *prima facie* showing, the burden shifts to the non-objecting party to articulate a race-neutral explanation for challenging the potential juror.  *Id.*

(3) If the non-objecting party articulates a race-neutral explanation, the burden shifts back to the objecting party to show purposeful discrimination, that is, the race-neutral explanation was a pretext for discrimination.  *Id.* at 96–98; *see Hernandez v. New York*, 500 U.S. 352, 358–59 (1991).

---

[8] The petitioner also argues that the decision was contrary to clearly-established federal constitutional law, but "raises no argument that the state court identified the wrong legal standard; he therefore must show an unreasonable application."  *Sorto v. Herbert*, 497 F.3d 163, 171 (2d Cir. 2007).

Citing *Dolphy v. Mantello*, 552 F.3d 236 (2d Cir. 2009), the petitioner asserts that "the New York state courts' decisions are not entitled to any AEDPA-deference because neither the trial court nor the Appellate Division ever made a specific finding that the prosecutor's race-neutral reasons were credible." (ECF No. 1 at 28.) *Dolphy* is different. The Second Circuit found that the trial court's *Batson* decision was not "adjudicat[ed] on the merits" because the trial court "failed to assess the credibility of the prosecution's explanation" and that trial court "seemed to assume that a race-neutral explanation (*Batson* step two) was decisive and sufficient." *Id.* at 239. In its "conclusory statement," the trial court did not "indicate — even by inference — that [it] credited the prosecution's explanation, especially since [] the judge's words suggested that the proffer of a race-neutral explanation was itself enough." *Id.* Accordingly, the Second Circuit concluded that the state court decision was not entitled to AEDPA deference.

Here, on the other hand, the trial court and the Appellate Division credited the prosecution's race-neutral reasons for its exercise of peremptory challenges. The trial court held that "the People have given race neutral reasons for their challenges," which the court credited as "sufficient responses to show that [the prosecution's] challenges were not based on race." (T. Tr. 401–03.) A court "applying the third *Batson* prong need not recite a particular formula of words, or mantra;" it must "somehow make clear whether it credits the . . . race-neutral explanation." *Dolphy*, 552 F.3d at 239; *see also Taylor v. Roper*, 577 F.3d 848, 865 n.7 (8th Cir. 2009) (an "implicit" "evaluation of credibility" suffices under the third *Batson* step).

In affirming the trial court's ruling, the Second Department explained that the petitioner "failed to satisfy his ultimate burden of demonstrating . . . that the prosecutor's race-neutral explanation for the questioned peremptory challenges was a pretext for racial discrimination." (ECF No. 1-9 at 1.) The Second Department's statement was a clear adjudication under step

three of the *Batson* analysis.  The state court resolution of the petitioner's *Batson* challenge is therefore entitled to AEDPA-deference.[9]

The petitioner also argues that the Second Department's decision was based on an unreasonable determination of facts and an unreasonable application of clearly established federal constitutional law because an "application of the factors recognized by the Supreme Court to be evidence of purposeful discrimination to this record leads to one conclusion: that the prosecution engaged in race-based use of peremptory strikes."  (ECF No. 1 at 29.)  The petitioner points to "numerical evidence that the prosecutor's use of peremptory strikes followed a consistent pattern," "that the prosecution did not exercise peremptory challenges against non-African-American venirepersons who were similarly situated as those stricken," and that the "prosecutor's explanations were highly suspect."  (*Id.* at 29–30.)  Assuming the petitioner made a *prima facie* case at the first *Batson* step,[10] the Second Department's rejection of his *Batson* claim was neither an unreasonable determination of facts nor an unreasonable application of clearly established federal constitutional law.

---

[9] The petitioner argues that the trial court "appeared to rely heavily upon its perception that one of the prospective jurors was 'combative,' an argument not advanced by the prosecutor."  (ECF No. 1 at 29.) The trial court was entitled to rely on its own observations of the prospective juror's demeanor.  In any event, the Second Department did not mention the trial court's statement that one of the jurors was combative; rather, it held that under step three of *Batson*, the petitioner did not satisfy his burden of demonstrating that the prosecutor's race-neutral explanations were pretextual.  (ECF No. 1-9 at 1.)  *See Ylst*, 501 U.S. 797; *Stinson*, 229 F.3d 112 (the court must review the last reasoned state court decision).

[10] Although the Second Department focused on step three of the *Batson* analysis (*see* ECF No. 1-9 at 1), the trial court ruled that the petitioner did not make a *prima facie* showing of discrimination; the trial court allowed but did not require the prosecution to respond (T. Tr. 397, 401).  Accordingly, the petitioner is not correct that by concluding "that Petitioner failed to carry his burden on the third step of the *Batson* inquiry," the Second Department "necessarily found the first two steps to be satisfied, contrary to the trial court's findings that no prima facie case had been made."  (ECF No. 1 at 28.)  A ruling on step three is not an implicit ruling that the parties have met their burdens on the first two steps; rather, once the court has ruled on step three of *Batson* — the "ultimate question of intentional discrimination" — the "preliminary issue of whether the [petitioner] had made a prima facie showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

First, although the petitioner claims that there was "numerical evidence" of a "consistent pattern" (ECF No. 1 at 29), the record is in fact "incomplete on critical information that could confirm (or not) a pattern of discrimination," *DeVorce v. Philips*, 603 F. App'x 45, 47 (2d Cir. 2015).  A petitioner "cannot establish that the state court unreasonably concluded that the pattern was not sufficiently suspicious unless the petitioner can adduce a record of the baseline factual circumstances attending the *Batson* challenge."  *Sorto v. Herbert*, 497 F.3d 163, 171 (2d Cir. 2007).  The petitioner cites the following: (1) during the "first round of jury selection, the prosecution exercised two peremptory challenges, one against an African-American person;" (2) during the "second round, all four peremptory challenges exercised by the prosecution were against African-American venirepersons;" and (3) during the "third round," the prosecution used "yet another strike against an African-American venireperson."  (ECF No. 1 at 29.)  But this information is not "sufficient," and lacks "critical information;" for example, the record does not describe the racial "composition of the venire."  *DeVorce*, 603 F. App'x at 47; *see Sorto*, 497 F.3d at 171–72.  While the transcript identifies the race of some prospective jurors, it "does not indicate the race of every prospective juror, as would be required for an accurate count."  *DeVorce*, 603 F. App'x at 47.  Indeed, the parties disagreed about the race of various seated and prospective jurors.  (T. Tr. 397–98, 400.)  Thus, the record before the Second Department did not establish a pattern of discriminatory peremptory challenges.

The petitioner also argues that "the prosecution did not exercise peremptory challenges against non-African-American venirepersons who were similarly situated as those stricken." (ECF No. 1 at 29.)  The trial court accepted the prosecutor's explanation that he was concerned about two Black jurors' interests in the Bible might make it hard for them to "stand[ ] in judgment of other people."  (*Id.* at 398–99.)  The defense stressed that another juror that neither

side challenged — whom the defense categorized as Hispanic, but the prosecution categorized as Black (*see* T. Tr. 397–98)[11] — was similarly situated because she told the trial court that she sang in a church choir in her free time. (*Id.* at 403). The trial court held that this juror was "different than somebody who regularly reads the Bible or whose hobby is reading the Bible," noting that she "started off by saying as a hobby she sings," and that it was only revealed that she sang in a church choir when the court "inquired further." (*Id.*) The Second Department affirmed. (ECF No. 1-9 at 1.)

"[C]ourts in this Circuit have found that any inference of discrimination based on the single shared characteristic can be undermined by other differences between the jurors." *Parsons v. Artus*, No. 06-CV-6462, 2020 WL 2572739, at *35 (W.D.N.Y. May 21, 2020) (internal quotation marks omitted). The trial court identified a legitimate "difference[] between the jurors," *id.*, and the petitioner has not shown that this was either an unreasonable determination of facts or an unreasonable application of clearly-established federal constitutional law.

Third, the petitioner's argument that the prosecution gave "highly suspect" explanations is unpersuasive. The petitioner states that "the prosecution believed (factually wrongfully) that the defense had used peremptory challenges against white jurors, [so] it was justified in exercising challenges against black jurors." (ECF No. 1 at 30.) This is an inaccurate representation of the record. The prosecution did not justify its peremptory challenges by referring to defense counsel's use of peremptory challenges; rather, the prosecution asked the Court to "revisit its decision" on the prosecution's *Kern* challenge "if the Court is now going to

---

[11] Because the prosecution and the petitioner did not agree on whether this juror was Black or Hispanic, it is not clear that she is a proper comparator to the Black jurors at issue. (*See id.* at 397–98.)

find that because the People perempted four of eight people[, ]that represents a pattern."  (T. Tr. 399–400.)

The petitioner also argues the prosecution's challenges were based on "some of the challenged jurors' religious beliefs or activities," which violates *Foster v. Chatman*, 578 U.S. 488 (2016), in which the Supreme Court found that the prosecution's strikes of two jurors — despite the prosecution's extensive list of race-neutral explanations, including attendance of a particular church — were pretextual and race-motivated.  (ECF No. 1 at 30.)  In *Foster*, the "record persuade[d] [the Court] that [the juror's] race, and not his religious affiliation, was [the prosecution's] true motivation" for the peremptory challenge, 578 U.S. at 509–10, as there was evidence that the "prosecutor's proffered reason for striking a black panelist applie[d] just as well to an otherwise-similar nonblack [panelist] who [was] permitted to serve," and there were "shifting explanations, [] misrepresentations of the record, and [a] persistent focus on race in the prosecution's file," *id.* at 512–13.  The Court did not hold that every race-neutral explanation that included consideration of a juror's churchgoing habits was pretextual.  As discussed above, the petitioner has not identified compelling evidence of similarly situated jurors here.  Nor is there any other evidence of racial animus comparable to the "shifting explanations, [] misrepresentations of the record, and [a] persistent focus on race in the prosecution's file."  *Id.* at 512–13.

Accordingly, the denial of the *Batson* challenge was not based on an unreasonable determination of facts or an unreasonable application of Supreme Court precedent.

## II.   Evidentiary Rulings

The petitioner argues that the trial court violated his due process right to present a defense and to a fundamentally fair trial by precluding him from introducing into evidence (1) photographs of Randy with a BMW automobile, jewelry, and a bag of drugs, and

(2) photocopies of Randy's text exchanges in which he discussed future drug transactions. (ECF No. 1 at 31.) According to the petitioner, "[t]he theory of defense was that [Randy] attempted to rob Petitioner and the codefendant, not of marijuana, but of cocaine, that [Randy] was going to resell," and that the precluded evidence "was critical to the defense theory." (*Id.* at 32–33.)

The Second Department held that there was "no merit" to the petitioner's argument that the trial court's "evidentiary rulings violated his right to present a defense" because the photographs "were not relevant" and "any probative value was outweighed by the possible prejudicial impact on the jury." (ECF No. 1-9 at 2.) Moreover, the petitioner was not prejudiced by the court's refusal to allow photocopies of the text exchanges "because these text messages were read in their entirety into the record by defense counsel and the jury was free to request a read back of the content of the messages." (*Id.*)

Even if there were an error — and there was not — habeas relief is not warranted unless the error deprives the defendant of a fundamentally fair trial in violation of the Constitution. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973)). "Specifically, whether the exclusion of [] testimony violated [the petitioner's] right to present a defense depends upon whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." *Stinson*, 229 F.3d at 120 (cleaned up). "On habeas review, trial errors are subject to lenient harmless error review." *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

The trial court's evidentiary rulings were correct. In any event, the disputed evidence would not have "create[d] a reasonable doubt that did not otherwise exist." *Id.* at 120 (cleaned up). The photographs of Randy were "wholly irrelevant to the issue of whether [the petitioner]

had committed the charges crimes." *Crispino v. Allard*, 378 F. Supp. 2d 393, 408–09 (S.D.N.Y. 2005).  Moreover, as the trial judge and the Second Department explained, there was no need to admit photocopies of Randy's text messages "because these text messages were read in their entirety into the record by defense counsel and the jury was free to request a read back of the content of the messages."  (ECF No. 1-9 at 2.)

The petitioner was not prevented from arguing that Randy was a drug dealer — he introduced photos of Randy with large quantities of money and he cross-examined him extensively, using his text messages, about whether he was dealing drugs.  (T. Tr. 1162–63, 1181.)  The Second Department's affirmation of the trial judge's evidentiary rulings was not contrary to or an unreasonable application of clearly established federal constitutional law.

## III.   The Prosecutor's Summation

The petitioner challenges the prosecutor's comments in summation.  The Second Department rejected these comments as "largely unpreserved for appellate review" and otherwise "without merit."  (ECF No. 1-9 at 2.)

First, a general objection to summation (or otherwise) "is not sufficient" to preserve a claim for appeal under New York's "contemporaneous objection rule."  *Downs v. Lape*, 657 F.3d 97, 102–103 (2d Cir. 2011) (discussing N.Y. Crim. Proc. L. § 470.05(2)).  A defendant preserves his claim for appellate review only when he names "the specific error" the prosecution committed, *id.* at 104, so that the trial court has an opportunity to consider a concrete legal error "at the time of [its] ruling," N.Y. Crim. Proc. L. § 470.05(2).  This rule ensures that "parties draw the trial court's attention to any potential error while there is still an opportunity to address it," and prevents "those who fail to do so from 'sandbagging' the opposing party and the trial court on appeal."  *Whitley v. Ercole*, 642 F.3d 278, 288 (2d Cir. 2011) (citations omitted).

Defense counsel registered only general objections to most of the challenged comments. (*See* T. Tr. 2155–57, 2171, 2173, 2187, 2189–90.) Accordingly, the Second Department found the petitioner's claims about the summation comments "largely unpreserved for appellate review." (ECF No. 1-9 at 2.) Because the Second Department's decision was based on a "state law ground . . . independent of the federal question," a federal court may not review it unless the state law ground was not "adequate to support the judgment." *Coleman*, 501 U.S. at 729. The ground is "adequate" when "the rule upon which the state court relied is firmly established and regularly followed" in the State. *Downs*, 657 F.3d at 102 (internal quotation marks and citations omitted). The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." *Id.* at 104 (collecting cases). This Court, therefore, has no authority to grant habeas relief regarding summation comments to which no contemporaneous objection was made.[12]

The only arguably preserved claim is to the prosecutor's statement that the petitioner was "in the vestibule area while Jamel Williams [was] in the car, again, trying to get Randy Rupansingh out," and "that's what the testimony is, . . . we haven't heard anything differently." (*Id.*) The court overruled the defense's objection that this remark was burden-shifting. (*Id.* at 2189–90.) Even assuming this ruling was error, the trial court instructed the jury on the burden of proof, including that the petitioner had no burden, a charge to which the petitioner's counsel

---

[12] In certain "exceptional cases," the state court's "exorbitant application of a generally sound rule renders the state ground inadequate." *Downs*, 657 F.3d at 102 (citations omitted). This is not one of those cases, because the state court applied a well-settled rule to a routine situation — and the petitioner does not seek an exception. Nor does the petitioner articulate any cause for the default and prejudice that would allow this Court to look beyond the state court's procedural decision and assess the merits. *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (explaining that "cause may be demonstrated with a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by state officials made compliance impracticable or that the procedural default is the result of ineffective assistance of counsel" (cleaned up)).

did not object.  (*Id.* at 2211–15); *see McManus v. Vann*, No. 18-CV-3800, 2019 WL 3767538, at

\*14 (E.D.N.Y. 2019) (burden-shifting remark did not require habeas relief given court's

instructions on burden of proof), *certificate of appealability denied*, 2020 WL 8024517 (2d Cir.

2020), *cert. denied*, 141 S. Ct. 1086 (2021).

New York courts also consider the "cumulative" effect of summation errors, even when

defendants' challenges are "not preserved for appellate review" and when the trial court

"sustain[s]" some of the objections.  *People v. Redd*, 141 A.D.3d 546, 550–51 (2d Dep't 2016);

*see also People v. Nelson*, 68 A.D.3d 1252, 1255 (3d Dep't 2009).   The petitioner alleges that

the prosecutor "disparag[ed] defense counsel, invit[ed] . . . the jury to speculate as to matters that

were not in evidence such as what might have happened and the mental processes of Petitioner,

vouch[ed] for the credibility of the prosecution witness, and . . . attempt[ed] to shift the burden of

proof."  (ECF No. 1 at 36.)

The Second Department's rejection of the defendant's challenges to these statements was

not "unreasonable" or "contrary to . . . Federal law."  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C.

§ 2254(d)).  As the U.S. Supreme Court explained, it "is not enough that the prosecutors'

remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S.

168, 180–81 (1986) (citation omitted).  Rather, the "relevant question is whether the

[prosecutors'] comments so infected the trial with unfairness as to make the resulting conviction

a denial of due process."  *Id.* (internal quotation marks and citation omitted).  To determine

whether a summation deprived a defendant of due process, courts examine "(1) the severity of

the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any

prejudice; and (3) whether the conviction was certain absent the prejudicial conduct."  *Bentley v.

Scully*, 41 F.3d 818, 824 (2d Cir. 1994).

Citing *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990), the petitioner claims that "the prosecutor's highly improper and inflammatory arguments so infected the trial with unfairness as to make the resulting conviction a denial of due process." (ECF No. 1 at 37 (internal quotation marks omitted).) *Floyd* was a "rare" case where "the improper comments in a prosecutor's summation were so numerous and, in combination, so prejudicial that a new trial [was] required." 907 F.2d at 348. The prosecution "repeatedly informed the jury, over 30 times, that Floyd was a 'liar' or 'lied' to witnesses in his statements." *Id.* at 351. She also told the jury it was their "concomitant responsibility not to allow the Fifth Amendment burden of proof beyond a reasonable doubt to be a shield for the guilty." *Id.* "At no time during these arguments did the trial court intervene," and "[t]he court did not give a curative charge." *Id.* at 351–52.

Nothing like that happened in this case. To the extent that the prosecutor made improper comments, the trial judge took immediate corrective action in sustaining counsel's objections. (*See* T. Tr. 2157, 2170–71, 2173, 2184, 2189–90.) Following the prosecutor's summation, the court instructed the jury that the summations were not evidence, and that it could not consider any comments to which the court sustained objections and struck. (*Id.* at 2214–16.) In its final charge, the court again instructed the jury that they were the "judges of the facts" and that they must disregard any comments that were stricken from the record. (*Id.* at 2209–10.)

Moreover, there was compelling evidence of the petitioner's guilt, including video evidence, eyewitness testimony, and the medical evidence that the victim was stabbed in the neck. *See United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ("Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof is strong, then the prejudicial effect of the comments tends to be deemed insubstantial . . . .").

In short, the Second Department's rejection of the petitioner's claim with respect to the prosecution's summation was not an unreasonable application of clearly-established federal constitutional law.

## CONCLUSION

For these reasons, the petition is denied in its entirety.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2553(c).


**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge


Dated: Brooklyn, New York
      September 24, 2024